J-A14012-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| CHRISTIAN L. ANDRUSIS AND THERESA A. MACURAK, CO-ADMINSTRATORS OF THE ESTATE OF LAURA J. ANDRUSIS, DECEASED | : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellants | : : : : | |
| v. | : : : | No. 1242 WDA 2018 |
| MICROVENTION, INC., A CORPORATION; ALLEGHENY GENERAL HOSPITAL, A CORPORATION; ROBERT WILLIAMS, M.D.; AND ALLEGHENY RADIOLOGY ASSOCIATES, LTD., A CORPORATION | : : : : : : : | |

Appeal from the Order Entered August 17, 2018
In the Court of Common Pleas of Allegheny County
Civil Division at No(s): GD-08-016008

BEFORE: OTT, J., KUNSELMAN, J., and MUSMANNO, J.

MEMORANDUM BY OTT, J.: **FILED DECEMBER 26, 2019**

Christian L. Andrusis and Theresa A. Macurak, Co-Administrators of the Estate of Laura J. Andrusis, deceased (collectively, "Administrators"), appeal from the judgment entered August 17, 2018, in the Allegheny County Court of Common Pleas in favor of defendants, Robert Williams, M.D. ("Dr. Williams"), Allegheny General Hospital ("Hospital"), and Allegheny Radiology Associates ("Radiology"),[1] following a jury trial in this medical malpractice action. Administrators raise three issues on appeal: (1) the trial court erred

_____

[1] We will refer to these three parties collectively as "Defendants."

in admitting testimony concerning the decedent's informed consent to the procedure; (2) the trial court erred in granting a compulsory nonsuit to additional defendant, MicroVention, Inc.; and (3) the trial court abused its discretion when it permitted Hospital and Dr. Williams to present cumulative expert testimony. For the reasons below, we affirm.

The facts underlying Administrators' medical malpractice claim are as follows. In November of 2005, during a procedure to repair a subarachnoid hemorrhage, the decedent's neurosurgeon discovered she had an aneurysm on the superior tip of her basilar artery. *See* N.T., 11/28/2017-12/7/2017, at 415-416. After recovering from the first procedure, the decedent was referred to Dr. Williams, an interventional radiologist, to treat the aneurysm. In June of 2006, Dr. Williams met with the decedent and her daughter, Theresa Macurak, to discuss a treatment plan. Because of the location of the aneurysm at the brain stem of the skull, Dr. Williams recommended the decedent undergo a cerebral angiogram and endovascular coiling of the aneurysm.[2] *See id.* at 418-420, 537-538

On August 8, 2006, Dr. Williams performed the procedure on the decedent at Hospital. He chose to use a Boston Scientific SL-10 microcatheter, paired with a MircoVention HES-14 HydroCoil. *See id.* at 313-314, 580-581.

---

[2] The procedure involves inserting stents through the femoral artery, and maneuvering them through a microcatheter until reaching the aneurysm. Detachable coils are then guided though the microcatheter into the aneurysm, where they are designed to swell, fill the aneurysm, and promote clotting. *See* N.T., 11/28/2017-12/7/2017, at 532, 547-548, 579-580.

Dr. Williams acknowledged the HES-14 coil was larger than what was recommended for use with the SL-10 microcathether. The SL-10 mircocatheter he used had a diameter of .0165 inches, and MicroVention recommended using a microcatheter with a diameter of .019 inches with the HES-14 coil. *See id.* at 653. Nevertheless, after consultation with another doctor, Dr. Williams paired the smaller microcatheter, which was more pliable than a larger microcatheter and would track better through the artery, with the larger coil because it would better fill the decedent's aneurysm. *See id.* at 580-581, 587-589.

Dr. Williams testified he placed the first coil in position within 90 seconds. *See id.* at 586, 590. However, because the coil was in the dome of the aneurysm, rather than across the neck of the aneurysm, Dr. Williams had to reposition it. *See id.* at 587. He testified he was able to reposition the coil within three minutes. *See id.* at 590, 659-660. It merits mention MicroVention's "Instructions for Use" ("IFU") provides strict time frames for the repositioning of the coil once it is introduced into the microcatheter, and directs that the coil and microcatheter should be removed if they cannot be positioned and detached within the specified time frame. *See id.* at 316-317. Because Dr. Williams had paired the coil with a microcatheter that was not recommended, he and another doctor chose three minutes as the repositioning time. *See id.* at 589-590, 658. After placing the coil within the targeted time period, and confirming its position with an angiogram, Dr. Williams attempted to detach the coil from the pusher wire using a "V-grip"

detachment device, so that he could insert another coil. *Id.* at 591-592.

However, as he explained, the coil would not detach from the pusher wire:

> I wasn't getting the proper signal. I kept working with that. And I followed what the company suggested. Wipe it down. Try to work on the contact, and … I don't remember all of the colors and lights, but it didn't work.

*Id.* at 591. Dr. Williams attempted to remove the coil with a second, and later third, "V-grip" device, which still did not work.[3] *See id.* at 593-594. Ultimately, because he could not detach the coil from the pusher wire, Dr. Williams determined the coil had to be removed. *See id.* at 595. As Dr. Williams attempted to pull the coil back into the microcatheter, he felt "friction." *Id.* at 596. He hoped, however, the coil would "swell a little bit more [and] really lock into the microcatheter" so he could remove the entire device. *Id.* at 597. However, when he removed the microcatheter, he realized the stent had provided resistance against the coil, and the coil had broken off and remained "floating in the basilar artery." *Id.* at 599. The doctor then used a third stent to secure the coil in the vertebral artery, and abandoned the original procedure. *See id.* at 599-600. The decedent was

---

[3] During this time, someone on Dr. Williams' team also placed a call to their MicroVention representative for assistance. *See* N.T., 11/28/2017-12/7/2017, at 593-594. MicroVention manufactured the Hydrocoil, as well as the pusher wire and "V-grip" used to detach the coil from the pusher wire. *See* Cross-Claim, 4/17/2013, at ¶ 26. It did not manufacture the mircocatheter.

transferred to the intensive care unit. Later that evening, however, her aneurysm ruptured, and she died on August 11, 2006.

Administrators initiated this medical malpractice action by writ of summons filed on August 5, 2008. In addition to Dr. Williams, Hospital and Radiology, Administrators also listed MicroVention as a defendant. Although MicroVention remained on the caption, Administrators' complaint, filed on November 29, 2012, included no claims against the company. Rather, Administrators alleged Dr. Williams, in his capacity as an agent or employee of Hospital and Radiology, committed medical malpractice with respect to his care of the decedent. *See* Complaint, 11/29/2012. After filing an answer and new matter, Hospital filed a cross-claim against MicroVention on April 17, 2013, asserting the company was negligent in its design and/or manufacture of the HES-14 coil and detachment device. *See* Cross Claim, 4/17/2014.

The case proceeded to a jury trial commencing on November 29, 2017. On December 7, 2017, the jury returned a verdict finding Dr. Williams was not negligent in his care of the decedent. Administrators filed timely post-trial motions, which the court denied on August 17, 2018. Dr. Williams filed a praecipe for entry of judgment on August 30, 2018, and this timely appeal followed.[4]

---

[4] On September 5, 2018, the trial court ordered the Administrators to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). The Administrators complied with the court's directive, and filed a concise statement on September 19, 2018.

- 5 -

In their first issue on appeal, Administrators assert the trial court erred when it permitted testimony and evidence regarding the decedent's "alleged consent to and understanding of the risks and complications of her … aneurysm coiling procedure." Administrators' Brief at 34. Relying upon **Brady v. Urbas**, 111 A.3d 1155 (Pa. 2015), they maintain "evidence that a patient affirmatively consented to treatment after being informed of the risks of that treatment is generally irrelevant to a cause of action sounding in medical negligence." Administrators' Brief at 34-35. While they recognize some evidence regarding consent/risks may be relevant to establishing or refuting negligence, Administrators contend the testimony and evidence presented at trial herein should have been excluded. **See id.** at 35-36. Because the evidence erroneously admitted in this case confused and misled the jurors, Administrators insist they should be granted a new trial. **See id.** at 42.

When considering a claim challenging the trial court's ruling on the admissibility of evidence, we are guided by the following:

> Generally, relevant evidence is admissible and irrelevant evidence is inadmissible. Evidence is relevant if it has "any tendency to make a fact [of consequence] more or less probable than it would be without the evidence." Pa.R.E. 401. The threshold for relevance is low given the liberal "any tendency" prerequisite. **Id.** (emphasis added). Relevant evidence "is admissible, except as otherwise provided by law." Pa.R.E. 402. One such exception is that relevant evidence may be excluded "if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Pa.R.E. 403.

> Decisions regarding the admissibility of evidence are vested in the sound discretion of the trial court, and, as such, are reviewed for an abuse of discretion. *See Commonwealth v. Wright*, 621 Pa. 446, 78 A.3d 1070, 1086 (2013). An abuse of discretion occurs where the trial court "reaches a conclusion that overrides or misapplies the law, or where the judgment exercised is manifestly unreasonable, or is the result of partiality, prejudice, bias, or ill will." *Id.* at 1080. To the degree the issue of whether the law has been misapplied involves a purely legal question, it is reviewed *de novo*. *See Hoy v. Angelone*, 554 Pa. 134, 720 A.2d 745, 750 (1998).

*Mitchell v. Shikora*, 209 A.3d 307, 314 (Pa. 2019). Furthermore, "[a]n erroneous evidentiary ruling does not warrant a new trial unless it was 'harmful or prejudicial to the complaining party.'" *Flenke v. Huntington*, 111 A.3d 1197, 1200 (Pa. Super. 2015) (quotation omitted).

In *Brady*, *supra*, the Pennsylvania Supreme Court held "in a trial on a [medical] malpractice complaint that only asserts negligence, and not lack of informed consent, evidence that a patient agreed to go forward with the operation in spite of the risks of which she was informed is irrelevant and should be excluded." *Brady*, *supra*, 111 A.3d at at 1162-1163. Indeed, the Court explained "assent to treatment does not amount to consent to negligence, regardless of the enumerated risks and complications of which the patient was made aware." *Id.* at 1162. Nevertheless, the *Brady* Court declined to adopt a "broad pronouncement" that such evidence is never admissible in a medical negligence trial. *Id.* Rather, the Court recognized some informed consent evidence "may be relevant to the question of negligence if, for example the standard of care requires the doctor discuss certain risks with the patient." *Id.* at 1161. Under the particular facts of that

case, however, the Court found the evidence permitted by the trial court, which specifically focused on the patient's signed consent forms, was irrelevant "to the central question pertaining to whether the defendant's actions conformed to the governing standard of care," and affirmed the order granting a new trial. *Id.* at 1163.

Recently, the Supreme Court revisited this issue in *Mitchell*, *supra*. Finding its decision in *Brady* had been misconstrued, the *Mitchell* Court opined:

> [O]ur Court in *Brady* spoke in terms of two discrete categories of evidence: (1) informed-consent evidence; and (2) risks and complications evidence. As to the first category, the Court plainly held that manifestations of a patient's actual, affirmative consent to surgery, and the risks thereof, are irrelevant to the question of negligence. *Brady*, 111 A.3d at 1162. Thus, where a patient's action is limited to medical negligence, and not a lack of informed consent, all evidence that a patient agreed to go forward with the operation, in spite of the risks of which she was informed, is irrelevant and should be excluded. *Id.* at 1162-63.
>
> However, the Court contrasted this with other types of evidence, such as evidence of risks and complications. Indeed, the *Brady* Court specifically rejected the Superior Court's *per se* rule that "all aspects of informed-consent information are always 'irrelevant in a medical malpractice case.'" *Id.* at 1162. Rather, evidence of the risks and complications of a surgical procedure, "in the form of either testimony or a list of such risks as they appear on an informed-consent sheet" could be "relevant in establishing the standard of care." *Id.*[9]

_____

[9] While the *Brady* Court offered that a list of such risks "as they appear on an informed-consent sheet" may be relevant with respect to the standard of care, we interpret this to mean the generic offering of such risks, and not the informed-consent sheet itself. *Id.* at 1161. Indeed, to offer into evidence the informed-consent sheet itself would

- 8 -

> undermine the clear distinction made in **Brady** between informed consent evidence and risks and complications evidence, and such a proffer, absent special justification, would unnecessarily risk the very dangers regarding a jury receiving irrelevant informed consent evidence warned of in **Brady**.

**Mitchell**, **supra**, 209 A.3d at 317. The **Mitchell** Court went on to explain the types of risks and complications evidence that may be admissible in a negligence only trial.

> Determining what constitutes the standard of care is complicated, involving considerations of anatomy and medical procedures, and attention to a procedure's risks and benefits. Further, a range of conduct may fall within the standard of care. While evidence that a specific injury is a known risk or complication does not definitively establish or disprove negligence, it is axiomatic that complications may arise even in the absence of negligence. We emphasize that "[t]he art of healing frequently calls for a balancing of risks and dangers to a patient. Consequently, if injury results from the course adopted, where no negligence or fault is present, liability should not be imposed upon the institution or agency actually seeking to assist the patient." As a result, risks and complications evidence may clarify the applicable standard of care, and may be essential to provide, in this area, a complete picture of that standard, as well as whether such standard was breached. Stated another way, risks and complications evidence may assist the jury in determining whether the harm suffered was more or less likely to be the result of negligence. Therefore, it may aid the jury in determining both the standard of care and whether the physician's conduct deviated from the standard of care.

**Id.** at 318 (internal citations omitted). Contrary to **Brady**, the **Mitchell** Court determined the evidence of potential risks and complications presented by the defendants at the medical negligence trial in that case was admissible. **See id.** at 323 ("[W]e find the trial court herein properly distinguished between

informed-consent evidence, which it did not admit, and surgical risks and complications evidence, which it admitted.").

As for the case before us, prior to trial, Administrators filed a motion in *limine* seeking to preclude any testimony regarding the decedent's informed consent to the risks of the surgery because the action alleged only medical negligence.[5] During argument on the motion, Dr. Williams' attorney stated he had "no problem with … agreeing to not presenting any testimony that the injury was the result of a risk or complication or suggesting that during the trial of the case." ***See*** N.T., 11/28/2017-12/7/2017, at 13. Counsel for Hospital agreed, but noted that it would be "appropriate to discuss what the physicians discussed and generally what the risks and complications of the procedure could be." ***Id.*** at 14. Following further discussion, the court granted Administrators' motion "as worded" but recognized another ruling might be necessary at trial. ***Id.*** at 18. The order that was entered, stated the following:

> AND NOW this 28th day of November, 2017, upon consideration of the foregoing Motion in Limine to Exclude Testimony Regarding Risks and Complications, it is hereby ORDERED, ADJUDGED, and DECREED that said Motion is GRANTED and Defendants are prohibited from presenting testimony that [the decedent's] injury was the result of a risk or complication of her procedure or suggesting the same at any point during the trial of this case.

---

[5] We note Administrators' motion in *limine* is included in the certified record. However, it is stamped as filed on February 22, 2018, after trial occurred. Nevertheless, none of the parties dispute the fact that Administrators did file a motion in *limine* before trial, and the trial court referred to the motion during pretrial arguments. ***See*** N.T., 11/28/2017-12/7/2017, at 10.

Order, 11/28/2017. The court also handwrote on the order, "granted as per the record." *Id.*

Administrators contend Defendants violated the court's order in the following manner. First, during his direct examination, Dr. Williams explicitly referred to the fact that the decedent signed an informed consent form:

> Q. And prior to the procedure taking place, did you again meet with the family or just see the patient in the operating room?
>
> [Dr. Williams:] No. I came into the holding area. [The decedent] was there. Her daughter was there. I believe she was on her left side. I came in from her right. And I apologized. I was sorry that there was such a delay, and I explained what happened, and **then we had her sign the informed consent and she was prepared. She understood the risks**.

N.T., 11/28/2017-12/7/2017, at 564 (emphasis supplied). Administrators' counsel immediately objected, and requested a mistrial at sidebar. *See id.* at 564-565. Dr. Willams' counsel apologized, and conceded the doctor "went way too far" in his answer, which was "not responsive to [counsel's] question." *Id.* at 565. He suggested the court instruct the jury that informed consent is not an issue in the case. *See id.* After further discussion, the trial court denied the motion for mistrial, and gave the following cautionary instruction to the jury:

> Prior to the recess, actually prior to trial, okay, this Court ordered that informed consent was not to be discussed at this trial.
>
> Right before the recess, Dr. Williams inappropriately referenced informed consent and also the patient's understanding of the procedural risks.
>
> These comments are to be stricken from the record and to be disregarded by the jury. Okay?

*Id.* at 577.[6]

The trial court found, however, that Dr. Williams' comment did not mandate a new trial. We agree. The court acknowledged it was "concerned" Dr. Williams' specific reference to informed consent was "improper and technically violated the [pretrial] order." Trial Court Opinion, 12/7/2018, at 15. However, the court concluded Dr. Williams' answer was "not a substantive violation" of the court's pretrial ruling because it was limited and did not include any specific testimony regarding "risks and complications or whether [the decedent] understood or fully consented to the procedure and actual risks and complications[.]" *Id.* at 16. The court found the answer was "unresponsive, unsolicited, and unexpected by everyone, … [and] did not mislead or confuse the jury as to medical negligence." *Id.* Nevertheless, the court gave the jury a cautionary instruction, informing them that Dr. Williams "inappropriately referenced informed consent" despite a prior ruling that it was not to be discussed at trial. *Id.* at 17.

We find no reason to disagree. While Dr. Williams' unresponsive answer did violate the pretrial ruling, the trial court acted within its discretion when it declined to grant a mistrial.[7] As the court explained, Dr. Williams' brief

---

[6] The court declined to instruct the jury that Dr. Williams violated an order of court, as suggested by Administrators. *See id.* at 571-576.

[7] *See Bugosh v. Allen Refractories Co.*, 932 A.2d 901, 914–915 (Pa. Super. 2007) ("Generally, the granting or refusal of a mistrial is a matter within the discretion of the trial judge, and his or her decision will not be overruled by an appellate court except for manifest, clear, or palpable error amounting to an abuse of discretion."), *appeal dismissed as improvidently granted*, 971 A.2d 1228 (Pa. 2009).

reference to informed consent was unresponsive to the question asked, and the court issued a cautionary instruction, telling the jury Dr. Williams "inappropriately referenced informed consent" when the court had previously ordered that it was not to be discussed. Trial Court Opinion, 12/7/2018, at 17. We agree this instruction was sufficient to cure any prejudice from Dr. Williams' remark.

Further, we find the facts in this case distinguishable from those in **Brady**, **supra**, where the Supreme Court concluded a new trial was warranted. In that case, the defendant doctor attempted to rebut the allegations of negligence by focusing on the consent forms signed by the plaintiff. The defendant doctor "questioned [the plaintiff] at length about her having signed the consent forms, elicited [his own] testimony on the topic, and made references to the fact of [the plaintiff's] consent during [] summation[.]" **Brady**, **supra**, 111 A.3d at 1163. Conversely, the trial court here found Dr. Williams' comment did not constitute a flagrant or intentional violation of the court's pretrial ruling. Significantly, Defendants did not discuss at length the signed consent forms, as in **Brady**, nor did Dr. Williams' brief mention of the words "informed consent" have an instant prejudicial effect.[8] Accordingly, we agree the court's cautionary instruction was sufficient to cure

_____

[8] **Compare Poust v. Hylton**, 940 A.2d 380, 385 (Pa. Super. 2007) (holding defense counsel's reference to cocaine metabolite in victim's system at the time of death was "flagrant and intentional use of this obviously prejudicial word 'cocaine', in violation of the prior pre-trial preclusion order," which entitled plaintiff to a new trial), *appeal denied*, 959 A.2d 320 (Pa. 2008).

any prejudice as a result of Dr. Williams' unresponsive answer. *See Commonwealth v. Jones*, 668 A.2d 491, 503-504 (Pa. 1995) (holding a jury is presumed to follow a court's cautionary instructions), *cert. denied*, 519 U.S. 826 (1996).

Second, Administrators point to Dr. Williams' cross-examination of the decedent's daughter, Theresa Macurak, when counsel asked if the doctor discussed "the risks of this particular procedure" with the decedent. *Id.* at 439. Counsel for Administrators objected, arguing that the question violated the court's pretrial "clear-cut ruling that the issues of risk and complications in this procedure were off limits[.]" *Id.* at 440. Dr. Williams' counsel asserted, however, the question was in response to Administrators' opening statement in which Administrators told the jury "Dr. Williams did not tell [the decedent] about certain things relating to her procedure." *Id.* The court overruled the objection. Counsel's follow-up question simply inquired of Macurak whether Dr. Williams "discuss[ed] with you about the risks of this procedure that your mom was about to undergo?" *Id.* at 442. Marcurak responded, "He did." *Id.* There was no further testimony regarding specific risks or potential complications.

With regard to this cross-examination, the trial court determined defense counsel's questioning did not elicit any testimony regarding specific risks or complications of the procedure. *See* Trial Court Opinion, 12/7/2018, at 12. Rather, the court found the questions were a proper response to Administrators' "opening statement, where it was alleged that Dr. Williams

failed to tell the [d]ecedent 'a certain thing' about the procedure[,]" as well as an inference from Macurak's direct testimony that Dr. Williams told the decedent the procedure was "easy." *Id.* Therefore, the court concluded Defendants' brief questions to Macurak was an appropriate response.[9] Again, we agree.

Our review of the record reveals that, during their opening statement, Administrators stated decedent's aneurysm treated by Dr. Williams was "not dangerous or life-threatening," and the decedent "readily agreed" to undergo the coiling procedure because "[i]t's a much less invasive procedure" than surgery, with a "much lower recovery time." N.T., 11/28/2017-12/7/2017, at 181, 183. They argued that they did not fault him for recommending the procedure, but rather, "we do fault him, and we fault him enormously for what he did during the procedure; something he did that he never told [the decedent] he was going to do." *Id.* at 184. Thereafter, during Macurak's cross-examination, Dr. Williams' counsel asked Macurak if Dr. Williams told the decedent it would be an "easy" procedure, to which she responded, "I don't know if it was easy, but it was going to be much less invasive." *Id.* at 439. Counsel then asked, generally: "[A]mong the things that [Dr. Williams] discussed with you during that one-hour meeting … did he also discuss with

---

[9] The court opined, "[t]his [argument] is a clear example of [Administrators] wanting their cake and eating it too[.]" Trial Court Opinion, 12/7/2018, at 12.

you and your mom the risks of this particular procedure?" *Id.* At that point, Administrators' counsel objected. Following a sidebar discussion, the court overruled the objection, and counsel re-asked Macurak whether Dr. Williams discussed "the risks of this procedure that your mom was about to undergo?" *Id.* at 442. Macurak responded, "He did." *Id.* When asked if she remembered any specifics about the "percentages of risk," Macurak responded that she did not. *Id.* She did agree, however, that the decedent was impressed with the amount of time Dr. Williams spent explaining the procedure to her, believing he was "thorough." *Id.* at 443. As evident from this excerpt, Defendants did not elicit any testimony regarding the specific risks or complications discussed with the decedent prior to the procedure. Accordingly, the trial court concluded,

> [d]efense counsel's questioning was general in nature and limited in scope and did not infer that the [d]ecedent's injury or death was caused by any known risk or complication with the procedure. Defense counsel's questioning did not elicit any testimony enumerating any specific risk or complications but rather tended to show that Dr. Williams had spent a significant amount of time explaining to the [d]ecedent and her family her medical options and the nature of the procedure without getting into informed consent and specific risks and complications. This line of questioning counters [Administrators'] opening statement, where it was alleged that Dr. Williams failed to tell the [d]ecedent "a certain thing" about the procedure … [as well as] an inference that [Administrators'] counsel had made on direct that Dr. Williams had told [] Macurak and her mom that it was an "easy" procedure.

Trial Court Opinion, 12/7/2018, at 12. We find no reason to disagree.

Third, Administrators insist Defendants violated the ruling when they "presented to the jury" parts of the coiling device's Instructions for Use ("IFU")

- 16 -

during the direct examination of Dr. Williams' expert, Dr. Howard Dorne. Administrators' Brief at 41. The IFU included an area titled "Potential Complications." Dr. Williams' counsel posed the following question to Dr. Dorne:

> Q. There's an area down here called Potential Complications, and I don't want to get into all of this stuff, but essentially, the MicroVention documents say, "The potential complications include, but are not limited to." Then it goes on a list of things, including aneurysm rupture, et cetera, and it talks about difficult – premature or difficult coil detachment, right?
>
> A. Yes.
>
> Q. Okay. So this is what you were talking about before where you were aware that these things sometimes don't detach or that there's difficult coil detachment?
>
> A. Yes.
>
> Q. And that's right in the IFU, right?
>
> A. Yes. It is.

N.T., 11/28/2017-12/7/2017, at 785-786. Administrators' counsel did not immediately object to this line of questioning, but rather renewed his motion for a mistrial after Dr. Dorne's direct examination. *See id.* at 803-804. The court overruled the objection, stating, "I need to hear the objection at the time it was done." *Id.* at 804.

We agree with the court's ruling at the time of trial that Administrators' claim is waived because they failed to make a timely objection when the document was shown to the jury. "In order to preserve an issue for appellate review, an aggrieved party must make a timely and specific objection." ***Allied Elec. Supply Co. v. Roberts***, 797 A.2d 362, 365 (Pa. Super. 2002), *appeal*

*denied*, 808 A.2d 568 (Pa. 2002). Here, it was not until after the defense completed its direct examination of Dr. Dorne that Administrators objected to the fact Dr. Williams' counsel "flashed in front of the jury the risk and complications of this procedure[,]" claiming it violated the motion in *limine*. N.T., 11/28/2017-12/7/2017, at 803. The court overruled the objection stating, "frankly, I need to hear the objection at the time it was done." ***Id.*** at 804. We find no error in this ruling.

Furthermore, the trial court also noted the "jury's exposure to the IFU section 'Potential Complications' was minimal," and counsel referred only to the possible complication of the coil's failure to detach, "which was at the heart of the Defendants' defense." Trial Court Opinion, 12/7/2018, at 14. As our Supreme Court stated in ***Mitchell***, "risks and complications evidence may clarify the applicable standard of care, and may be essential to provide, in this area, a complete picture of that standard, as well as whether such standard was breached." ***Mitchell***, ***supra***, 209 A.3d at 318. Here, Administrators argued Dr. Williams acted negligently when he (1) used a combination of equipment not recommended by the manufacturer, and (2) employed a repositioning time that was not scientifically proven or accepted. ***See*** Administrators' Brief at 36. In addition to attempting to rebut those allegations, Defendants asserted the real reason for the complication was the coil's failure to detach, which, according to the IFU, was a potential complication. Accordingly, the trial court did not err in permitting this limited testimony, and Administrators' first claim warrants no relief.

Next, Administrators contend the trial court erred when it granted MicroVention's motion for a compulsory nonsuit at the conclusion of trial, and refused to submit a strict liability "malfunction theory" claim to the jury. **See** Administrators' Brief at 43.

As noted *supra*, Administrators did not assert any claims against MicroVention in their complaint. However, Hospital filed a cross-claim against the company, contending its HydroCoil and delivery system were defectively designed and/or manufactured. **See** Cross Claim, 4/17/2013, at ¶ 31. Counsel for both Dr. Williams and Hospital argued in their opening statements that the product's failure to detach was the cause of the complication that occurred during the decedent's coiling procedure, and not any actions taken or decisions made by Dr. Williams. **See** N.T., 11/28/2017-12/7/2017, at 240-245, 253-257. However, after Administrators presented their case-in-chief, Defendants informed the trial court they had entered into a confidential settlement agreement with MicroVention, and did not intend to present evidence against the company at trial. **See id.** at 480-481. Microvention, in turn, requested the court grant a compulsory nonsuit since Administrators presented no evidence of a product defect during their case-in-chief. **See id.** at 481. Administrators objected to the nonsuit, insisting they should receive "the benefit of [the Hosptial's] joinder[,]" because they could "theoretically … establish a case against MicroVention during the cross-examination of Dr. Williams." **Id.** at 482. Ultimately, the trial court agreed with Administrators that "a nonsuit at this time would be inappropriate." **Id.** at 503. However,

after Defendants presented their case-in-chief, MicroVention renewed its motion for a compulsory nonsuit. *See id.* at 1017. The court took the matter under advisement, and later granted that motion. *See id.* at 1042.

Our review of a court ruling granting a compulsory nonsuit is well-established:

> A trial court may enter a compulsory nonsuit on any and all causes of action if, at the close of the plaintiff's case against all defendants on liability, the court finds that the plaintiff has failed to establish a right to relief. Pa.R.C.P. No. 230.1(a), (c); *see Commonwealth v. Janssen Pharmaceutica, Inc.*, 607 Pa. 406, 8 A.3d 267, 269 n.2 (2010). Absent such finding, the trial court shall deny the application for a nonsuit. On appeal, entry of a compulsory nonsuit is affirmed only if no liability exists based on the relevant facts and circumstances, with appellant receiving "the benefit of every reasonable inference and resolving all evidentiary conflicts in [appellant's] favor." *Agnew v. Dupler*, 553 Pa. 33, 717 A.2d 519, 523 (1998). The compulsory nonsuit is otherwise properly removed and the matter remanded for a new trial.
>
> *Scampone v. Highland Park Care Ctr.*, 618 Pa. 363, 57 A.3d 582, 595–96 (2012). The appellate court must review the evidence to determine whether the trial court abused its discretion or made an error of law. *Barnes v. Alcoa, Inc.*, 145 A.3d 730, 735 (Pa. Super. 2016).

*Baird v. Smiley*, 169 A.3d 120, 124 (Pa. Super. 2017).

In the present case, Administrators argue the trial court erred in removing the strict liability, product defect claim from the jury because, while there was no direct evidence presented of a specific manufacturing defect in the coiling system, there was sufficient evidence to support a "malfunction theory" strict liability claim. Administrators' Brief at 43.

The Pennsylvania Supreme Court first adopted the malfunction theory in **Rogers v. Johnson & Johnson**, 565 A.2d 751 (Pa. 1989). The malfunction theory allows a plaintiff to prove a product defect with circumstantial evidence, when the plaintiff "may not be able to prove the precise nature of the defect." **Id.** at 754.

> [The malfunction theory] permits a plaintiff to prove a defect in a product with evidence of the occurrence of a malfunction and with evidence eliminating abnormal use or reasonable, secondary causes for the malfunction. It thereby relieves the plaintiff from demonstrating precisely the defect yet it permits the trier-of-fact to infer one existed from evidence of the malfunction, of the absence of abnormal use and of the absence of reasonable, secondary causes.

**Id.** (internal citations omitted). Therefore, in order to present a *prima facie* case of a manufacturing defect pursuant to the malfunction theory, a plaintiff must establish: (1) "circumstantial evidence that the product had a defect, even though the defect cannot be identified[;]" and (2) "evidence eliminating abnormal use or reasonable, secondary causes" so that the jury can infer the defect caused the injury. **Barnish v. KWI Bldg. Co.**, 980 A.2d 535, 541 (Pa. 2009). The Supreme Court explained:

> By point of comparison, a plaintiff does not present a *prima facie* malfunction theory case if the plaintiff's theory of the case includes facts indicating that the plaintiff was using the product in violation of the product directions and/or warnings. In such a case, no reasonable jury could infer that an unspecified defect caused a malfunction when the more likely explanation is the abnormal use. Similarly, if the plaintiff's theory of the case includes another cause for the malfunction such as a improper maintenance or substantial wear and tear from regular use, a reasonable jury could not conclude that the product was defective at the time of delivery when facts presented by the plaintiff

- 21 -

suggest a cause for the malfunction unrelated to the alleged, unspecified defect.

*Id.* at 542.

We will presume, for the sake of argument, there was sufficient circumstantial evidence of the coiling system's malfunction to satisfy the first element of a malfunction theory claim.[10] Dr. Williams himself testified the device "didn't work" because the coil "didn't detach," and encouraged the decedent's family to investigate MicroVention. *See* N.T., 11/28/2017-12/7/2017, at 631-632, 635. Macurak testified that Dr. Williams told the family "he was upset with the product, the trigger mechanism, and he did not ever want to use it again[.]" **Id.** at 425. Expert witness, Dr. Dorne, testified on direct examination that "these types of non detachments can and do occur even when the surgeon does everything correctly." **Id.** at 747. He also acknowledged under cross-examination that he stated in his expert report, the "root cause from the failure of [the decedent's] brain aneurysm coiling procedure was the catastrophic failure of detachment of the MicroVention HydroCoil system." **Id.** at 817-818. Furthermore, Administrators' expert, Dr.

_____

[10] We note the trial court concluded the evidence of the coil system's failure to detach was **not** "legally sufficient evidence of a malfunction" because it was a rare, but foreseeable risk, of using the product. Trial Court Opinion, 12/7/2018, at 21 ("The fact that the coil failed to detach is not evidence of a malfunction where non-detachment was a known possibility as outlined in the manufacturer[']s IFU.").

Charles Kerber, acknowledged that "[f]ailure to detach is generally a product problem."[11]  *Id.* at 372.

Nevertheless, as the trial court explains in its opinion, even when plaintiffs present evidence of a product malfunction, they are still "required to provide evidence eliminating abnormal use or reasonable secondary causes for a malfunction" in order to present a *prima facie* case under the malfunction theory.  Trial Court Opinion, 12/7/2018, at 21.  This is where Administrators' claim fails.  The court opined:

> The record is clear that the [Administrators'] original theory in their medical malpractice case was that Dr. Williams used the coil in an abnormal way.  Specifically, [their] expert Dr. Kerber testified that Dr. Williams failed to follow the manufacturer's instructions when he chose to use the incorrect micro catheter (sic) (SL-10) with the HES-14 HydroCoil.  In addition, [the Administrators'] other theory of negligence was that Dr. Williams exceeded the scientifically proven and accepted repositioning time for the combination of the equipment used, including the HydroCoil.  The evidence of other reasonable, secondary causes or abnormal use was clearly presented in the [Administrators'] medical malpractice cases and thus contradicts the establishment of a *prima facie* malfunction case.  Contrary to [the Administrators' concise] statement, the [Administrators'] own proof of abnormal use or secondary causes, along with their lack of proof of malfunction or product defect, precluded the jury from considering this issue as a matter of law.

*Id.* at 22.

---

[11] On direct examination, however, Dr. Kerber opined that the product at issue did not malfunction.  After inspecting the coiling system, Dr. Kerber concluded "this coil detached" as it was designed to do.  N.T., 11/28/2017-12/7/2017, at 339.  However, he opined Dr. Williams had an "error of perception" which led to the "clinical misadventure."  *Id.* at 340.  Dr. Kerber agreed it was "Dr. Williams['] knowing violation of the standard of care that caused this misadventure and resulted in [the decedent's] death[.]"  *Id.*

Administrators insist, however, the trial court erred in focusing solely on their case-in-chief. Rather, they emphasize "Defendants' defense to [their] malpractice claim was that there was no misuse of the system at any time during the coiling procedure, and that the system was being operated exactly as anticipated and directed by the manufacturer." Administrators' Brief at 47. They maintain:

> If the jury believed the evidence presented by Dr. Williams, the jury would conclude that Dr. Williams was not negligent, rather, that the product malfunctioned. By so concluding the jury would have eliminated the secondary cause cited by the trial court.

*Id.* at 48. Moreover, Administrators argue that pursuant to **Rogers**, "a plaintiff is permitted to present to the jury a malfunction case and an alternative theory of negligence[.]" **Id.** (emphasis in original).

We find Administrators have misconstrued the elements required to set forth a *prima facie* malfunction theory case. In **Barnish**, the Supreme Court made clear that in order to establish a malfunction theory claim, the plaintiff (here, Administrators) must present a case "free of abnormal use and secondary causes[.]" **Barnish**, **supra**, 980 A.2d at 542. **See also Rogers**, **supra**, 565 A.2d at 755 ("[W]e believe that so long as the plaintiffs presented a case-in-chief free of secondary causes which justified the inference of a defect in the product, the jury was free to accept their scenario.") (footnote omitted). Indeed, the Court explained that if the plaintiff's theory included facts that the plaintiff was using the product in violation of its directions, or the product malfunction could have been caused by improper maintenance,

- 24 -

"no reasonable jury could infer that an unspecified defect caused a malfunction" when either (1) "the more likely explanation is the abnormal use" or (2) "the facts presented by the plaintiff suggest a cause for the malfunction unrelated to the alleged, unspecified defect." **Barnish**, **supra**, 980 A.2d at 542.

In the present case, Administrators' theory of the case not only included facts indicating the product was used in violation of its directions, their entire case was built upon the premise that the coiling system did **not** malfunction, but rather, Dr. Williams' negligence led to the decedent's death. **See** N.T., 11/28/2017-12/7/2017, at 339-340. Indeed, Administrators' expert witness, Dr. Kerber, testified he inspected the coiling system at issue, and he was confident it did detach. **See id.** at 339. Rather, in his opinion, Dr. Williams violated the standard of care when he (1) combined the SL-10 microcatheter with the HES-14 HydroCoil;[12] (2) estimated a repositioning time that was not scientifically proven; and (3) committed an "error of perception" when he believed the coil did not detach. **See id.** at 315-315, 317-318, 340. As such, because Administrators' case was not "free of abnormal use and secondary causes," they did not establish a *prima facie* malfunction theory case sufficient to proceed to the jury. **Barnish**, **supra**, 980 A.2d at 542. **See also Schlier**

---

[12] Dr. Kerber testified: "I think the surgeon picked the wrong device and an incompatible device and got into trouble and couldn't get out of trouble, and that led to the death. It's … really that simple." N.T., 11/28/2017-12/7/2017, at 305.

*v. Milwaukee Elec. Tool Corp.*, 835 F. Supp. 839 (E.D. Pa. 1993) (finding plaintiff failed to establish *prima facie* case of product malfunction where "[b]ased on plaintiff's own evidence, there is at least one secondary cause which could account for the accident[,]" that is, plaintiff noticed the saw at issue was dirty and the blade was not new).[13]

Administrators insist, however, that their choice to pursue a malpractice claim against Dr. Williams did not preclude them from also arguing a malfunction theory claim to the jury. *See* Administrators' Brief at 48. In fact, they contend this "exact dichotomy of competing product liability and medical malpractice theories" was addressed, and approved of, by the Court in *Rogers*. *Id.* Indeed, the *Rogers* Court noted the Superior Court, in its earlier opinion, had implied "a plaintiff who has presented a malfunction case will always be precluded from proceeding upon an alternative theory of negligence." *Rogers*, *supra*, 565 A.2d at 755. Disagreeing with this contention, the Court stated:

> It is altogether possible that a plaintiff's injuries could be caused jointly by a defective product and also by third party negligence so long as the negligence does not constitute a supervening cause of the malfunction. "Given the occurrence of a malfunction, the [alleged] negligence assumes legal significance only if it was a superseding cause.... Questions of proximate causation should normally be left to the finder of fact."

---

[13] "While we recognize federal district court cases are not binding on this court, Pennsylvania appellate courts may utilize the analysis in those cases to the extent we find them persuasive." *Braun v. Wal-Mart Stores, Inc.*, 24 A.3d 875, 954 (Pa. Super. 2011) (quotation omitted), *aff'd*, 106 A.3d 656 (Pa. 2014), *cert. denied*, 136 S.Ct. 1512 (U.S. 2016).

*Id.* (quotation and footnote omitted).

While the Court's comment seems to support Administrators' claim, it is important to consider it in the context of that case. In ***Rogers***, the plaintiff received severe burns on his leg following the application of a plaster splint to immobilize a broken leg. ***See id.*** at 752. He initiated a claim against Johnson & Johnson, the manufacturer of the plaster splint, as well as the hospital where he had the procedure. At trial, the plaintiff "presented expert testimony eliminating medical malpractice as the cause of the burns," while Johnson & Johnson presented expert testimony "indicating that the medical malpractice of the doctors had caused the splint to overheat[.]" ***Id.*** at 753 (footnote omitted). The jury returned a verdict for the plaintiff on the malfunction theory claim. The Superior Court reversed on appeal, holding that because Johnson & Johnson presented sufficient evidence of the doctor's negligence, the malfunction theory should not have been submitted to the jury because the plaintiff did not eliminate all reasonable, secondary causes for the malfunction. ***See id.*** As noted above, the Supreme Court reversed the Superior Court's ruling, holding:

> The Superior Court erred because it considered incompatible the plaintiffs' evidence of malfunction in light of the defendant, Johnson & Johnson's, evidence of a reasonable secondary cause. It rendered impossible the ability of the plaintiffs to negate secondary causes suggested by Johnson & Johnson's evidence and essentially required a directed verdict in favor of Johnson & Johnson. Contrarily, we believe that so long as the plaintiffs presented a case-in-chief free of secondary causes which justified the inference of a defect in the product, the jury was free to accept their scenario.

*Rogers*, *supra*, 565 A.2d at 755 (footnote omitted).

In the present case, however, **the plaintiffs** (Administrators) proceeded **only** on a claim of medical malpractice, and attempted to "back door" a malfunction theory claim through the Defendants' case-in-chief. This is certainly not the same situation as in *Rogers*, where the "alternative theory of negligence" was presented by the defendant. *Id.* at 755. Indeed, in a footnote, the *Rogers* Court explained:

> In this instance, for example, if the jury had chosen to believe Johnson & Johnson's evidence that [the doctor's] failure to heed [the plaintiff's] complaints regarding a sensation of warmth constituted negligence such negligence would not supervene the cause of [the plaintiff's] injuries, namely, the defective material of which the splint was made.

*Id.* at 755 n.7. Our research has uncovered no cases in which a plaintiff attempted to establish a malfunction theory case through the defendants' case-in-chief, while pursuing **only** an alternative theory of liability in his or her case-in-chief. Indeed, the malfunction theory allows the jury to "infer the existence of a defect from the fact of a malfunction." *Barnish*, *supra*, 980 A.2d at 541. However, as the Supreme Court explained in *Barnish*, if the plaintiff presents evidence that the product was used "in violation of the product directions and/or warnings" or "the plaintiff's theory of the case includes another cause for the malfunction," a reasonable jury could not "infer that an unspecified defect caused a malfunction when the more likely explanation is the abnormal use" or other cause. *Id.* Here, Administrators' theory of case was that Dr. Williams' pairing of the SL-10 microcatheter with

the HES-14 HydroCoil, as well as his estimated repositioning time frame, caused the complication which led to the decedent's death. Accordingly, we find no error in the trial court's decision to grant MicroVention a compulsory nonsuit at the conclusion of trial.[14]

In their third, and final, issue, Administrators contend they are entitled to a new trial because the trial court erroneously permitted Defendants to present cumulative expert testimony. *See* Administrators' Brief at 50. Prior to trial, Administrators sought a motion in *limine* to preclude Hospital and Dr. Williams from presenting separate expert witnesses on the relevant standard

_____

[14] In her Concurring and Dissenting Memorandum, Judge Kunselman asserts the Supreme Court's decision in **Rogers**, **supra**, is controlling, and our attempt to distinguish it on its facts is erroneous. **See** Concurring and Dissenting Memorandum, at 6-8. Indeed, Judge Kunselman sees no difference as to whether the plaintiff presents the malfunction theory or negligence theory; accordingly, so long as the party that presents the malfunction theory is free of secondary causes, "the claim of product malfunction should have gone to the jury." **Id.** at 6. We disagree. The malfunction theory of product liability is "reminiscent of the logic of a *res ipsa loquitur* case," and may be pursued only when the **plaintiff** eliminates all other causes for the injury. **Barnish**, **supra**, 980 A.2d at 541 ("By demonstrating the absence of other potential causes for the malfunction, the plaintiff allows the jury to infer the existence of defect from the fact of a malfunction."). Although Judge Kunselman believes which party pursues the theory is irrelevant, we find the language of the case law clear. Moreover, while the **Rogers** Court did not specifically state the "plaintiff's ability to recover under these alternative theories of liability was limited only to cases where the plaintiff filed the products liability claim," **see** Concurring and Dissenting Memorandum, at 8, we decline to expand application of the limited malfunction theory to include the facts in this case, where the plaintiff's expert opined the product **did not malfunction**.

of care.[15]  **See** N.T., 11/28/2017-12/7/2017, at 19.  Hospital asserted that, because they are separate parties, they "should have a right to an expert of their choosing."  **Id.** at 20.  The court agreed, and denied Administrators' motion.

On appeal, Administrators argue the court should not have allowed both Hospital and Dr. Williams to present separate expert witness testimony at trial because they agreed to present a joint defense.  **See** Administrators' Brief at 50.  Administrators contend both experts - Dr. Howard Dorne for Dr. Williams and Dr. Alexander Coon for Hospital -

> reviewed the same set of documents and records and … arrived at the same conclusions (*i.e.* [Dr.] Williams was not negligent and met the applicable standard of care at all times during the course of the coiling procedure he performed on [the decedent] and [Dr.] Williams demonstrated proper neuro-interventional techniques and judgment during the entire course of the procedure).

**Id.**  While Admininstrators acknolwedge Dr. Williams and Hospital were separate parties, they insist that, because there were no independent allegations against Hospital,[16] "any expert testimony offered by the Hospital was in defense of [Dr.] Williams and was duplicative, cumulative, and prejudicial."  **Id.** at 51.  Furthermore, they emphasize they were prejudiced

---

[15] While a written motion in *limine* is not included in the certified record, the parties discussed this motion during pretrial arguments.  **See** N.T., 11/28/2017-12/7/2017, at 18-20.

[16] Indeed, Administrators' complaint alleged that Hospital and Radiology were "vicariously liable" for Dr. Williams' negligence.  Complaint, 11/29/2012, at ¶ 25.

by the court's ruling because counsel for both Dr. Williams and Hospital implied during their closing arguments that their three experts (which included Dr. Williams himself) "must be given greater weight than the sparse testimony presented by [Administrators'] one single witness." *Id.* at 53. Accordingly, Administrators argue the court erred in failing to award them a new trial.

As noted *supra*, "[d]ecisions regarding the admissibility of evidence are vested in the sound discretion of the trial court, and, as such, are reviewed for an abuse of discretion." *Mitchell*, *supra*, 209 A.3d at 314. Pursuant to Pennsylvania Rule of Evidence 403, a trial court "may exclude relevant evidence if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Pa.R.E. 403. Cumulative evidence has been defined as,

> "additional evidence of the same character as existing evidence and that supports a fact established by the existing evidence." … Evidence that bolsters, or strengthens, existing evidence is not cumulative evidence, but rather is corroborative evidence.

*Commonwealth v. G.D.M., Sr.*, 926 A.2d 984, 989 (Pa. Super. 2007) (quotation omitted), *appeal denied*, 944 A.2d 756 (Pa. 2008). *See also Klein v. Aronchick*, 85 A.3d 487, 501 n.7 (Pa. Super. 2014) (*citing G.D.M.*, *supra*), *appeal denied*, 104 A.3d 5 (Pa. 2014).

In *Klein*, *supra*, a panel of this Court found no error when a trial court permitted the defendants to present "three different expert witnesses on causation" because, while the experts "ultimately reached the same

conclusion, … they approached the issue from different clinical perspectives." *Id.* at 501 n.7. Similarly, in *Whitaker v. Frankford Hosp. of City of Philadelphia*, 984 A.2d 512 (Pa. Super. 2009), a panel of this Court found the trial court did not abuse its discretion when it permitted the plaintiffs to present two expert witnesses who each "touched briefly upon the subject matter that was thoroughly covered by the other expert witness." *Id.* at 522-523. The panel noted "[e]ach expert witness clearly and unequivocally established the necessary component of liability in his area of expertise[,]" and the "slightly cumulative nature of the intersecting testimony was not so harmful" that it required a new trial. *Id.* at 522-523.

In the present case, the trial court defended its ruling by explaining, "while both experts did cover some of the same subject matter, they did so from entirely different perspectives." Trial Court Opinion, 12/7/2018, at 23. The court opined:

> Dr. Dorne['s] and Dr. Coon's testimony is not cumulative as they were from different clinical backgrounds and thus testified from different perspectives. Dr. Dorne was verified as an expert as an interventional and neurointerventional radiologist. He was board certified in that field. Dr. Coon on the other hand testified as an expert in endovascular neurosurgery. He is board certified in that field and acts as the director of Endovascular Surgery at Johns Hopkins. As such, while the doctors may have provided some overlapping testimony, they testified from different expertise, much like the doctors in the *Klein* case.
>
> While this Court does recognize that some of the testimony by both Dr. Dorne and Dr. Coon was duplicative, they also testified separately regarding a number of items. Dr. Dorne defined the standard of care and noted that it does not require the physician to build in extra time during a procedure for the possibility of non-detachment. Furthermore, Dr. Dorne testified that Dr. Williams

appropriately reduced the reposition time for the Hydro coil from five to three minutes in [d]ecedent's procedure. Dr. Coon did not opine specifically on those two points.

Dr. Coon also testified regarding a different subject matter than Dr. Dorne. Dr. Coon provided testimony regarding the general process of placing a catheter through the stents and into the aneurysm called "sequential stenting". Additionally, Dr. Coon discussed the post-operative notes as well as the location of [d]ecedents's second aneur[y]sm, both topics not covered by Dr. Dorne.

As such, this Court finds that it did not err in permitting the testimony of both Dr. Dorne and Dr. Coon. In previously denying [Administrators'] Motion in Limine and now denying [Administrators'] request for Post-trial relief, this Court finds their testimony non-cumulative. The doctors were called by separate parties, who had separate interests and liability in this case. Furthermore, while the Court notes that some of the testimony provided by Dr. Dorne and Dr. Coon covered the same subject matter, the case law in Pennsylvania allows that, and scrutiny of each of their testimony and qualifications shows that they testified as doctors of different specialties, and covered certain topics where the other did not. Thus it was proper for this Court to allow it.

*Id.* at 24-25 (record citations omitted).

Our review of the record reveals no basis upon which to disagree with the trial court. Although we recognize Hospital's liability was only derivative of Dr. Williams' liability, as separate parties with separate counsel, they should be permitted to choose their own experts. None of the statutory or case law cited by Administrators contradict that principle. Nevertheless, we recognize a trial court may exclude evidence that is cumulative. Here, however, as the court opined, each expert testified regarding a topic that was not addressed by the other expert. Accordingly, no relief is warranted, and we rest on the court's well-reasoned basis.

Accordingly, because we conclude Administrators are entitled to no relief on the claims raised in this appeal, we affirm the judgment entered in favor of Defendants.

Judgment affirmed.

Judge Musmanno joins the memorandum.

Judge Kunselman files a concurring and dissenting memorandum.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>12/26/2019</u>