J-A21016-22

2022 PA Super 181

| | | |
|---|---|---|
| IN RE: ESTATE OF DAVID A. BYERLEY, DECEASED | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: DAVID M. BYERLEY | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2572 EDA 2021 |

Appeal from the Decree Entered November 16, 2021
In the Court of Common Pleas of Delaware County
Orphans' Court at No: 0093-2020-O

BEFORE:  LAZARUS, J., MURRAY, J., and McCAFFERY, J.

OPINION BY MURRAY, J.:                    **FILED OCTOBER 18, 2022**

David M. Byerley (Appellant) appeals from the decree directing probate of the February 16, 2018, will (Will) of his father, David A. Byerley (Decedent). Appellant is Decedent's only child and "beloved son."  Findings of Fact, 11/16/21, at 5 (quoting Will).  Appellee, Mary McGurk (Ms. McGurk), was Decedent's "dear friend."  **Id.** at 4 (same).  The parties dispute the provision of the Will granting Ms. McGurk a life estate in Decedent's home.  After careful review of the certified record and prevailing legal authority, we affirm.

**FACTS**[1]

---

[1] The Orphans' Court's findings of fact are extensive.  **See generally**, Findings of Fact, 11/16/21, at 2-105.  Regarding the parties, the court "found Ms. McGurk to be credible," and "did not find [Appellant] to be credible."  **Id.** at 102-03.  The Orphans' Court found Attorney Robert DiOrio, who drafted the 2018 Will, "to be credible."  **Id.** at 102.

Decedent was born on August 17, 1927, and died on August 10, 2019,

shortly before his 92nd birthday.  At the time of trial, Ms. McGurk was 73 years

old.  N.T., 10/15/20, at 186.  The Orphans' Court explained:

> At the time of his death, Decedent resided at 2587 Radcliffe Road, Broomall, Delaware County, Pennsylvania (the Property).
>
> Decedent [was] survived by his son, [Appellant,] and his long-time caregiver and friend, Mary McGurk.  On December 15, 1998, Decedent executed a Last Will and Testament (the 1998 Will) wherein [Appellant] was named the sole Executor and sole beneficiary.
>
> On February 16, 2018, Decedent executed a new Last Will and Testament (the 2018 Will) wherein Decedent provided for McGurk to have a life estate in the Property.  As in the 1998 Will, [Appellant] was named as the sole Executor and sole beneficiary under the 2018 Will.  The 2018 Will provides, in relevant part, as follows:
>
>> "SECOND; I give, bequeath and devise my estate as follows: 1. I give and devise my premises known as 2587 Radcliffe Road, Broomall, PA 19008, unto my Trustee hereinafter named, IN TRUST NEVERTHELESS, to be used for the sole occupancy of my dear friend, MARY MCGURK, until she vacates said premises, or upon her death, whichever shall first occur, and upon the occurrence of either event, this Trust shall terminate.  Thereafter, exclusive title to the property shall be transferred by my Trustee unto my beloved son, DAVID M. BYERLEY, per stirpes.  During the term of her occupancy, MARY MCGURK shall be solely responsible to timely pay all utilities for said premises."
>
> McGurk was Decedent's longtime friend and caretaker.  In approximately 2004, Decedent met McGurk at the Pet Smart Store where she worked.  During his weekly visit to Pet Smart, Decedent used to leave notes on McGurk's car, including a note asking her out to dinner and a note with a map to his home.  Sometimes when McGurk left work, Decedent would stand outside by her car and they would talk to each other.  McGurk testified that Decedent

- 2 -

tried for a long time to get her to date him and that he was such a nice and kind man; and therefore, she finally went out with him. When a fire caused McGurk to vacate her apartment, Decedent offered his storage room in the Property's basement to her. [Ms. McGurk] testified that following the fire, she lived with her aunt in Drexel Hill for a month, but never lived in her car or was homeless as alleged [by Appellant]. Eventually, Decedent and McGurk began dating, but it was a platonic relationship.

After dating for two years, McGurk moved into the Property in 2006. When she moved into the Property, McGurk was employed and had a checking account and a debit card. McGurk worked at Pet Smart until 2009 and then she went on Social Security. McGurk [testified that she] and her dog moved into separate quarters of the Property, specifically the top floor, and that Decedent insisted that she move into the home. McGurk further testified that there was no written lease agreement between her and Decedent.

Orphans' Court Opinion, 4/21/22, at 2-3 (record citations omitted).

When Ms. McGurk moved into the Property in 2006, Decedent was independent. *Id.* at 4. He drove until 2016; when Decedent stopped driving, Ms. McGurk drove Decedent "anywhere he needed to go." *Id.* at 55. As Decedent "became more physically compromised," Ms. McGurk's "caregiver duties increased," and she "began to go shopping, fix meals for [Decedent], do the laundry and dishes, and change his diapers." *Id.* (citations omitted).

Attorney Thomas Burke drafted Decedent's 1998 will.[2] N.T., 3/17/21, at 34. Attorney Robert DiOrio drafted the 2018 Will. N.T., 9/14/20, at 11.

---

[2] Appellant testified the "Burke's were lifelong friends" of the family, and Appellant grew up with the Burke brothers. N.T., 3/17/21, at 32. Jim Burke was a pulmonologist and Decedent's doctor; Jim's brother, Tom, was Decedent's lawyer. N.T., 3/17/21, at 32-33.

Attorney DiOrio explained that Decedent was referred to him by a previous client, not Ms. McGurk. N.T., 9/29/20, at 27. He did not know Ms. McGurk or her family. *Id.*

Attorney DiOrio testified Decedent "contacted me by telephone … probably sometime in 2017" to draft the Will. N.T., 9/14/20, at 8-10. Ms. McGurk accompanied Decedent to Attorney DiOrio's office on February 16, 2018.[3] *Id.* at 21. Attorney DiOrio stated, "when I discussed the Will with [Decedent,] it was just me and [Decedent]." *Id.* Attorney DiOrio had no concerns about Decedent's capacity to execute the Will, although Decedent had "somewhat of a hearing problem." *Id.* at 20-21, 23. Attorney DiOrio testified that Decedent exhibited no signs of weakened intellect, and he "would not have had him execute the will if I had thought so." *Id.* at 23; *see also id.* at 24-25 (stating, "Once again, I would not have had [Decedent] execute the will if I didn't believe it was his complete and full understanding and intention[.]").

Attorney DiOrio described Decedent:

> He looked like an elderly – he looked like the elderly nice man that I knew him to be in my brief relationship with him. He was – appeared to be appropriately dressed. He appeared to be focused on the task at hand. He responded appropriately to things that he wanted me to know and to things I was asking him. I don't

---

[3] Attorney DiOrio declined to provide responses he believed to "be protected by the attorney/client privilege and the duty of confidentiality." N.T., 9/14/20, at 13. He testified "as a witness" as opposed to his "role as an attorney." N.T., 9/29/20, at 13. He continued "to decline to answer [some questions] based on [his] duty [of confidentiality as counsel]." *Id.* at 14.

recall specifics … but there was nothing in his appearance or demeanor or behavior that lead me to believe that he was anything but cognizant and of free will and able to undertake the task at hand.

N.T., 9/29/20, at 20. Attorney DiOrio stated that Decedent "was in his 90s and he wasn't robust[.] … He looked like a 90 year old person." *Id.* at 74. Nonetheless,

[Decedent] was no different than my exposure to any other client that asks me to prepare a will for them and I saw nothing in my relationship with him that lead [*sic*] me to believe he was under any undue influence, which is more than influence, obviously, but undue influence I didn't see.

*Id.* at 23.

Attorney DiOrio stated that "[a]ccording to [Decedent], [Appellant] did not agree with certain things [Decedent] was involved with financially or otherwise as far as the home was concerned with Ms. McGurk." *Id.* at 38. Attorney DiOrio testified:

[Decedent] had a hearing impairment and therefore, [Ms. McGurk] would impart information to me based on the fact that [Decedent] had a hearing impairment and therefore, she would, quite loudly, so she could make sure apparently that he would hear also, give me information and I would confirm that information with him. So, my understanding of her role was someone who had assisted [Decedent,] according to both of them, in his life, assisting him in various ways, I guess as a – I don't want to say as a caregiver, but in the nature of a caregiver and therefore, she would call me and I got the impression that the purpose of her being involved in the calls was simply to be able to make sure [Decedent] heard everything that was going on during that call or during the meeting.

*Id.* at 42-43. He clarified that Decedent, "had a hearing impairment, but he wasn't deaf. He could hear." *Id.* at 43. In addition, "when I spoke with him

in my office, there was no doubt in my mind that he could relate to me and he could hear what I was saying even though [Ms. McGurk] was present also repeating some of the things to him quite loudly." *Id.* at 43-44.

Attorney DiOrio described his perception of the relationship between Decedent and Ms. McGurk:

> Originally, she was a tenant … but she did assist him with doctor's appointments. I'm not sure about grocery shopping and things of that nature, but I believe doctor's appointments and also checking in on him on a daily basis or frequently because she was living in the same building as him in the same home in what I believe was a separate apartment from the way it was described. So that sort of thing. That was my understanding, although she was a tenant and I believe she was paying rent.

*Id.* at 44.

With respect to the life estate, Attorney DiOrio testified that Decedent "was very, very adamant about what he wanted me to do in that will." *Id.* at 48. "He didn't use the word premises. I used the word premises, but he said my home. I want her to continue to live there. That's what he said." *Id.* at 68. "The [W]ill indicates that there's a trust and she will have sole occupancy until she vacates[.]" *Id.* at 67. The home is the only asset in the trust, and Appellant is the trustee. *Id.* at 68-69. Decedent "wanted [Ms. McGurk to be] responsible for the utilities and [Decedent] was quite aware that his son would be responsible for all the other expenses." *Id.* at 71. Attorney DiOrio explained:

> [Decedent] went through with me on a couple of occasions as far as what he wanted done. And as I said, he was rather adamant about it. I know I discussed it with him. But I know I discussed

it with him even separately without Ms. McGurk being there. I know there was at least once, perhaps more than once when I had him in my office alone. I spoke very loudly but Ms. McGurk was not present. She would be in the waiting area and I would review certain things with [Decedent] independent of Ms. McGurk.

*Id.* at 52.

It is undisputed that except for the life estate, the 1998 and 2018 wills are similar; in both wills, Appellant is the executor and beneficiary. *Id.* at 50-51. Attorney DiOrio reiterated:

I made sure that with [Decedent], just like every other client, … I went through every single line of the last will and testament to make sure the client understands, to make sure the client doesn't have any second thoughts, to make sure he fully appreciates what he's about to do.

\*\*\*

At all times I received the impression and understanding that [Decedent] was adamant about what he wanted to do. He was adamant about having his son be the executor. He was adamant about leaving the residuary estate to his son. He – I got the impression that he loved his son very much, but that he had some very strong feelings about Ms. McGurk and what he wanted to do for her. And that was my understanding and my experience with him.

*Id.* at 53-54.

Ms. McGurk testified that Decedent was "a very nice man. Everyone loved [him]." N.T., 10/15/20, at 55. She described him as "so kind," although their relationship was platonic. *Id.* at 57. Ms. McGurk was Decedent's friend and companion. As Decedent aged, Ms. McGurk assumed responsibility for his care. She testified she was never paid for taking care of Decedent. *Id.* at 60.

With respect to the life estate, Ms. McGurk testified the idea "was all" Decedent, and she never "said one word that [Decedent] didn't say first." **Id.** at 66. She testified that at the beginning of her relationship with Decedent, she was unaware of his finances. **Id.** at 97-98. She became aware of Decedent's finances as she began to help him more and drove him when he needed to go to the bank. **Id.** at 102.

After Decedent executed the 2018 Will, conflict arose between Decedent and Appellant. The Orphans' Court explained:

> McGurk testified that on or about March 13, 2019, Decedent found and showed the 1998 Will to McGurk and asked her to contact Attorney DiOrio to send a copy of the 2018 Will to Attorney Burke because [Decedent] was having trouble with Attorney Burke only wanting to deal with [Appellant]. (N.T. 10/15/20 at 109).

> McGurk testified on June 8, 2019, she called Attorney DiOrio on Decedent's behalf because she and Decedent wanted to have the Property's locks changed and that she made the call with Decedent sitting next to her. **Id.** at 142, 144-145; **See** R-1. McGurk further testified that at this time, Decedent asked her to call Attorney DiOrio about changing the Deed to McGurk or selling her the Property for a dollar. **Id.** McGurk testified that Decedent wanted to take this action to protect her from [Appellant] because Decedent and [Appellant] had discussions about [Appellant] not permitting McGurk to have [his] inheritance. (N.T. 10/15/20 at 141).

> McGurk testified that she told Decedent that she would not get the locks changed and called the police to discuss with Decedent about getting the locks changed because she did not want [Appellant] to accuse her of changing the locks. (N.T. 10/15/20 at 142-145). McGurk testified that following a discussion between the police, the locksmith, and Decedent about the locks being changed, the locksmith changed the Property's locks. **Id.** Several days later, Decedent gave a spare key to the Property to [Appellant]. **Id.** at 144. McGurk testified that

- 8 -

Decedent, then, told her to get the locksmith to return to the Property to change the locks again. *Id.*

McGurk testified that on June 13, 2019, she called Attorney DiOrio on Decedent's behalf about [Appellant] not having the right to remove $58,000 from the Wells Fargo TOD Account which was under Decedent's name and her name. (N.T. 10/15/20 at 69-70; 146-147, 149-150); *See* R-1. McGurk further testified that [Appellant] threatened to sue Decedent about this issue with the bank account. (N.T. 10/15/20 at 71). McGurk testified that [Appellant] stated that he would spend every nickel he had and that he was not going to let McGurk have that money or his inheritance, the Property. *Id.* at 71, 154-155.

McGurk testified that when Decedent discovered what occurred with the Wells Fargo TOD Account, he asked McGurk to immediately take him to Wells Fargo Bank. (N.T. 10/15/20 at 70-71). McGurk further testified that when the Wells Fargo Bank Manager informed [Decedent] that [Appellant] was involved in the transfer, Decedent asked the Wells Fargo Bank Manager to call [Appellant] about the removal of these funds from the Wells Fargo TOD Account. (N.T. 10/15/20 at 70-71). McGurk testified that the Wells Fargo Bank Manager called and informed Decedent that [Appellant] informed her that he would return the money to the Account. *Id.* McGurk testified that after [Appellant] removed the $58,000 in funds from the Wells Fargo TOD Account, Decedent wanted to remove [Appellant] as the POA. *Id.* at 70-71, 118. McGurk further testified that [Appellant] never returned the funds to this account. *Id.* at 70-71.

McGurk testified that initially, she called Attorney DiOrio on Decedent's behalf on June 14, 2019 regarding the removal of [Appellant] as Decedent's POA Agent. (N.T. 10/15/20 at 155, 158-159); *See* R-1. However, Attorney DiOrio declined to represent Decedent as to this issue because he could be called as a witness if [Appellant] sued. (N.T. 10/15/20 at 159). McGurk then contacted Thomas Speers, Esquire, on Decedent's behalf because Decedent felt the urgency to have [Appellant] removed as his POA Agent [and] prevent[ed] from being involved in Decedent's business. (N.T. 10/15/20 at 158). On June 14, 2019, McGurk took Decedent to Attorney Speers' Law Office after they left Wells Fargo Bank, because Decedent was adamant about removing [Appellant] as his POA Agent. *Id.* at 161. While Decedent met with Attorney Speers, McGurk sat and waited in

Attorney Speers' Law Office for a long time. *Id.* at 169. McGurk testified that Decedent asked Attorney Speers to remove [Appellant] as the POA Agent and that Attorney Speers prepared the document. *Id.* at 164.

McGurk testified that while at Attorney Speers' Law Office, there was a discussion about having Decedent's cognitive status evaluated. (N.T. 10/15/20 at 172). McGurk further testified that Attorney Speers stated that he and his legal assistant knew Decedent was capable; and that Decedent and McGurk knew Decedent was capable. *Id.* McGurk testified that Attorney Speers stated that since there is trouble, it would be wise to get someone [to] give him a test, and recommended [psychologist Kenneth Carroll, PhD,] perform the test. *Id.* at 172-173.

McGurk contacted Dr. Carroll via phone to set up an appointment for Decedent's evaluation to occur at the Property on July 8, 2019. (N.T. 10/15/20 at 173-174; 03/17/21 at 93-94). [Appellant] arrived at the Property when Dr. Carroll started Decedent's evaluation. *Id*. at 174. McGurk testified [Appellant] took Dr. Carroll outside the Property to speak with him. *Id.* McGurk further testified that Decedent's eyesight, hearing, and nerves were "shot that day." *Id.*

Orphans' Court Opinion, 4/21/22, at 11-13. Decedent died the following month.

Attorney Speers confirmed that Ms. McGurk contacted him in June 2019. N.T., 4/27/21, at 6. Attorney Speers stated he met with Decedent when he and Ms. McGurk came to his office to discuss Decedent's power of attorney. *Id.* at 36-37. Attorney Speers testified:

[Decedent] was very clear when he came in as to why he was coming in. He was very sure in his mind, knew his son. Knew his son had a power-of-attorney. Knew his son was on joint bank accounts that he had. And he was very concerned when he learned that the bank account at Wells Fargo that had been designated payable upon death to Mary had been withdrawn by [Appellant] and placed in another investment that did not bear her

- 10 -

name.

*Id.* at 15. Attorney Speers also testified:

> Other assets were to go to [Appellant]. [Appellant] was to get [the] residue of the house. So [Decedent] wasn't saying that he wasn't going to give anything to [Appellant] and give everything to [Ms. McGurk]. … He just wanted to be sure that she was taken care of and could live in the house.

*Id.* at 21; *see also id.* at 23 (stating Decedent, "was very clear about what he desired and why he desired it."). Attorney Speers opined that "it sounded like [Ms. McGurk] was afraid of [Appellant]. She was physically afraid of him. She was intimidated by him." *Id.* at 28. Attorney Speers testified Decedent,

> was concerned [Appellant] would challenge the will. And I said what the [Orphans' Court] just said, it's a year-and-a-half ago. I don't know how someone's going to prove that you were or are not competent a year-and-a-half ago. I don't know any doctors that would give that opinion. [B]ut he said he [was] concerned about [a] challenge of the will. I said, well, if you think you're competent you can get an examination. And I recommended a psychologist that I had court appointed recently in a guardianship case I had[.]

*Id.* at 29-30. Attorney Speers recommended Dr. Carroll, who Ms. McGurk subsequently contacted.

In July 2019, Dr. Carroll went to Decedent's home to evaluate him; Ms. McGurk and Appellant were at the home that day. *See id.* at 13 (Orphans' Court stating Appellant, "arrived at the Property when Dr. Carroll started Decedent's evaluation[, and] McGurk testified [Appellant] took Dr. Carroll outside the Property to speak with him[, and] further testified that Decedent's

eyesight, hearing, and nerves were 'shot that day.'") (record citations omitted). Decedent died on August 10, 2019.

## LEGAL ACTION

After Decedent died, the conflict continued between Appellant and Ms. McGurk, leading Ms. McGurk to initiate legal action. On February 27, 2020, Ms. McGurk filed a petition for Appellant to show cause why Decedent's Will "dated February 16, 2018, Should Not be Probated and Why this Honorable Court Should Not Appoint an Independent Executor and Trustee to Administer Said Estate and Trust." Petition, 2/27/20. Ms. McGurk requested that the Orphans' Court "determine which Last Will and Testament should be probated." Appellee's Brief at 2. Ms. McGurk sought to establish the validity of the 2018 Will and her right to remain at the Property. She asserted that Decedent "possessed the testamentary capacity to change his will to add a trust life estate" for Ms. McGurk. N.T., 11/14/20, at 4.

Appellant filed a response and cross-petition referencing "a mental competency evaluation by Dr. Kenneth Carroll." Response and Cross-Petition, 3/3/20, at 11. Appellant requested the Orphans' Court declare the 2018 Will "null and void," and "accept the original of [Decedent's] Last Will and Testament dated December 15, 1998 for probate." *Id.* at 12.

Ms. McGurk filed a motion in *limine* seeking to exclude the admission of Dr. Carroll's report and testimony because Dr. Carroll had interacted with Decedent nearly a year and a half after Decedent executed the 2018 Will.

Orphans' Court Opinion, 4/21/22, at 37.  Appellant filed a response arguing the "passage of time" should not preclude Dr. Carroll from testifying as "both an expert and fact witness."  Response in Opposition to Motion in *Limine*, 10/14/20, at 2, 4.[4]  Appellant attached a copy of Dr. Carroll's "Report of Psychological Examination" as Exhibit A.  ***See id.***  Appellant "argued that Dr. Carroll's testimony would still be relevant despite the timing of Decedent's [July 2019] evaluation in relation to the 2018 Will's execution."  Orphans' Court Opinion, 4/21/22, at 66.  The Orphans' Court found in favor of Ms. McGurk, and entered an order granting the motion in *limine*.  Order, 2/10/21.

Although the Orphans' Court had granted Ms. McGurk's motion in *limine*, the issue arose again a month later, when Appellant testified at trial.  Ms. McGurk's counsel objected to Appellant testifying about his interactions with Dr. Carroll.  N.T., 3/17/21, at 96, 98.  The court reiterated that evidence from Dr. Carroll would not be "relevant as to what happened on February 16 of 2018."  ***Id.*** at 97.  Appellant's counsel argued that Appellant's testimony "shows [Ms. McGurk] systematically taking control of [Decedent's] life.  That's what we're showing.  That's the undue influence."  ***Id.*** at 99.  The discussion continued:

_____

[4] Ms. McGurk's motion in *limine* to disqualify Dr. Carroll and Appellant's response appear on the docket out of order.  The former is listed as entry #16, time-stamped and entered October 19, 2021; the latter is listed as entry #14, is not time-stamped, and entered October 14, 2020.

- 13 -

[MS. McGURK'S COUNSEL]: Your Honor, this is a completely ridiculous argument by [Appellant's counsel]. Those facts are not in evidence. ...

THE COURT: [W]hy is – the issue is why is Dr. Carroll's testimony not relevant on July 9 or 10 of 2019?

[MS. McGURK'S COUNSEL]: It has no bearing on the mental capacity of [the Decedent] when he signed the will in February of 2018.

THE COURT: Go ahead, [Appellant's counsel]. I was just going to say I'll give you another chance to speak. I don't want to cut your opportunity off. … I always – you know I have to tell you I try to listen to both sides and sometimes I'm … well, you know what, you're right. I hadn't thought about that.

[APPELLANT'S COUNSEL]: Yeah. I mean what we have is M[s.] McGurk really taking control of the [D]ecedent. How was she doing that? Well, she's taking it to a new attorney, two new attorneys. Because now she's got to go to this attorney to —

THE COURT: Dr. Carroll, I'm talking about Dr. Carroll in July of 2019.

[APPELLANT'S COUNSEL]: All right. Right. And the question is why is M[s.] McGurk hiring — she hires, not the attorney who may have a valid issue about the client executing a power of attorney or a client executing a will. She hires this expert to come out and get competence [*sic*] so that she can get the power of attorney. So it all shows a power –

THE COURT: I'm going to sustain [Ms. McGurk's counsel's] objection.

[APPELLANT'S COUNSEL]: All right. Again, Your Honor, I would have an exception –

THE COURT: And you have an exception.

[APPELLANT'S COUNSEL]: So as I understand the question I can't have [Appellant] indicate why he found the doctor there … talking to [Decedent] and examining [Decedent] that day.

- 14 -

THE COURT: Well—

[APPELLANT'S COUNSEL]: I just want to clarify. So I know I can't ask [Appellant] the question. So [Appellant] shows up. I can't ask him the question—

THE COURT: Because it's not relevant. I don't see how it's relevant.

[APPELLANT'S COUNSEL]: Okay.

THE COURT: The power of attorney was revoked before [that day]. I mean [Appellant] — your client testified that he received this FedEx on June 28.

[APPELLANT'S COUNSEL]: Okay.

THE COURT: It's now July 9 or 10. So it's already afterwards.

[APPELLANT'S COUNSEL]: Right. So—

THE COURT: So I'm not … trying to be argumentative—

[APPELLANT'S COUNSEL]: I understand.

THE COURT: … I just don't see how it's relevant.

[APPELLANT'S COUNSEL]: Well, I understand.

THE COURT: And this is your case, you can do whatever you want. But I'll give you an exception so it's clearly on the record.

[APPELLANT'S COUNSEL]: Then I – I understand that **the doctor's opinion on competency** was two weeks after the revocation of power of attorney and a year later after the will was executed. So the question is why was he hired, why is he there and what is he doing there. And if I can't ask [Appellant] any of those questions or bring the doctor in to say what are you doing talking to [Decedent] and who hired you and why are you hired I don't understand. If you're telling me I can't ask at all then I can't ask at all.

- 15 -

THE COURT: That's my ruling.

N.T., 3/17/21, at 99-102 (emphasis added).

The Orphans' Court conducted six days of trial between September 14, 2020, and August 10, 2021. During trial, Appellant requested the court reconsider its grant of Ms. McGurk's motion in *limine*.[5] Ms. McGurk filed a response in which she continued to argue that Dr. Carroll's report was "completely irrelevant as it was drafted approximately one and a half years after" Decedent executed the Will. Response, 7/29/21, at 1. The Orphans' Court subsequently ordered:

> AND NOW, this 2nd day of August, 2021, upon consideration of [Appellant]'s Motion for Reconsideration of the February 10, 2021 Ruling Granting the Motion in *Limine* to Bar Dr. Kenneth Carroll's Testimony and response thereto, it is hereby ORDERED and DECREED as follows:
>
> 1. As to Dr. Carroll testifying as a fact witness, said Motion is GRANTED wherein [Appellant] may only rebut [Ms. McGurk's] testimony presented on October 15, 2021 on page 174, lines 14 through 16, as to [Appellant]'s interaction with Dr. Carroll on the day of Decedent's evaluation.
>
> 2. As to Dr. Carroll testifying as an expert witness, said Motion is DENIED.

Order, 8/2/21.

Following trial, the Orphans' Court reviewed the evidence before issuing its decision, which included findings of fact in excess of 100 pages. ***See***

---

[5] The docket indicates Appellant filed the motion for reconsideration on July 15, 2021.

*generally*, Findings of Fact, 11/16/21, at 2-105 (citing notes of testimony).

Critically, the Orphans' Court "found Ms. McGurk to be credible," and "did not

find [Appellant] to be credible." *Id.* at 102-03. The Orphans' Court also found

Attorney Robert DiOrio "to be credible." *Id.* at 102. The court concluded:

> The [Orphans'] Court finds that there is a lack of clear and convincing evidence that Ms. McGurk destroyed Decedent's free agency and engaged in such coercion of Decedent to restrain his ability to enter into and execute the February 16, 2018 Will.
>
> The [Orphans'] Court finds that as to undue influence, [Appellant] provided evidence only as to opportunity, suspicion, and mere conjecture; and therefore, failed to prove the existence of undue influence.
>
> The [Orphans'] Court finds that there is a lack of clear and convincing evidence that Decedent suffered from a weakened intellect.
>
> The [Orphans'] Court finds that based upon the evidence presented, Decedent had testamentary capacity when he entered into and executed the February 16, 2018 Will.
>
> The [Orphans'] Court finds that based upon the lack of clear and convincing evidence presented, Decedent was not subject to undue influence from Ms. McGurk.
>
> The [Orphans] Court finds that the February 16, 2018 Will is valid and should be submitted for probate with the Delaware County Office of Register of Wills.

Findings of Fact, 11/16/21, at 104-05 (paragraph numbers omitted).

Accordingly, the Orphans' Court issued a decree directing probate of the

2018 Will. Appellant filed a timely notice of appeal and court-ordered

statement of matters complained of on appeal pursuant to Pa.R.A.P. 1925(b).

**ISSUES**

Appellant presents two issues for our review:

A. Did the [Orphans'] Court commit a reversible error in barring the testimony of Dr. Kenneth Carroll, PhD, proffered as both fact witness and expert witness?

B. Did the [Orphans'] Court Abuse its Discretion as a Fact Finder when it made findings of fact contrary to the overwhelming evidence presented on the issues of (1) undue influence; and (2) confidential relationship and improperly excluded evidence supporting said issues?

Appellant's Brief at 4.

**ANALYSIS**

We begin our analysis of Appellant's issues by recognizing established legal authority. It is well-settled that the

appropriate scope and standard of review on appeal from a Decree of the Orphans' Court adjudicating an appeal from probate is as follows:

In a will contest, the hearing judge determines the credibility of the witnesses. The record is to be reviewed in the light most favorable to appellee, and review is to be limited to determining whether the [Orphans'] [C]ourt's findings of fact were based upon legally competent and sufficient evidence and whether there is an error of law or abuse of discretion. Only where it appears from a review of the record that there is no evidence to support the court's findings or that there is a capricious disbelief of evidence may the court's findings be set aside.

*In re Estate of Schumacher*, 133 A.3d 45, 49-50 (Pa. Super. 2016) (citation omitted). We "will not lightly find reversible error and will reverse an Orphans' Court decree only if the [O]rphans' [C]ourt applied an incorrect rule of law or

reached its decision on the basis of factual conclusions unsupported by the record." *In re Jerome Markowitz Trust*, 71 A.3d 289, 298 (Pa. Super. 2013).

The Pennsylvania Supreme Court has repeatedly held that the "best evidence of a testator's intent is the testamentary document itself and the testator's arrangements with his attorney." *See Estate of Agnew v. Ross*, 152 A.3d 247, 261 (Pa. 2017) (citations omitted).

Further,

> "The resolution of a question as to the existence of undue influence is inextricably linked to the assignment of the burden of proof." *In re Estate of Clark*, 461 Pa. 52, 334 A.2d 628, 632 (1975). Once the proponent of the will in question establishes the proper execution of the will, a presumption of lack of undue influence arises; thereafter, the risk of non-persuasion and the burden of coming forward with evidence of undue influence shift to the contestant. *Id.* The contestant must then establish, by clear and convincing evidence, a *prima facie* showing of undue influence by demonstrating that: (1) the testator suffered from a weakened intellect; (2) the testator was in a confidential relationship with the proponent of the will; and (3) the proponent receives a substantial benefit from the will in question. *Id.* Once the contestant has established each prong of this tripartite test, the burden shifts again to the proponent to produce clear and convincing evidence which affirmatively demonstrates the absence of undue influence. *Id.*

*In re Est. of Smaling*, 80 A.3d 485, 493 (Pa. Super. 2013) (footnote omitted).

Appellant argues the Orphans' Court erred in failing to find undue influence, stating: "It is critical for the Superior Court to understand the full import of [Ms.] McGurk's effect upon [Decedent's] testamentary dispositions

- 19 -

and his life in general." Appellant's Brief at 21 (citing ***Owens v. Mazzei***, 846 A.2d 700 (Pa. Super. 2004)).  In ***Owens***, we observed:

> Our Supreme Court has cautioned that "weakened mentality as relevant to undue influence need not amount to testamentary incapacity."  Consequently, the grantor's mental condition at the moment he authorized the transfer of his property is "not as significant when reflecting upon undue influence as it is when reflecting upon testamentary capacity. [**When the challenge is based on undue influence,] more credence and weight may be given to the contestant's remote medical testimony**."  Although our cases have not established a bright-line test by which weakened intellect can be identified to a legal certainty, they have recognized that it is typically accompanied by persistent confusion, forgetfulness and disorientation.  **The Orphans' Court's mandate in assessing such evidence is relatively broad.  If the court's decision rests upon legally competent and sufficient evidence, we will not revisit its conclusions**.  Under no circumstance will we substitute our judgment of credibility for that of the Orphans' Court.

***Owens***, 847 A.2d at 707 (citations omitted, emphasis added).

> We further recognize:

> [**W]eakened intellect in the context of a claim of undue influence need not amount to testamentary incapacity and will generally be proven through evidence more remote in time from the actual date of the will's execution**.  While Pennsylvania courts "have not established a bright-line test by which weakened intellect can be identified to a legal certainty, they have recognized that it is typically accompanied by persistent confusion, forgetfulness and disorientation." ***In re Estate of Fritts***, 906 A.2d 601, 607 (Pa. Super. 2006) (citations omitted).  **Importantly, in an undue influence case, "[the Orphans' Court] has greater latitude to consider medical testimony describing a [testator's] condition at a time remote from the date that the contested will was executed**." ***Id.*** (citation omitted).

*In re Estate of Nalaschi*, 90 A.3d 8, 14 (Pa. Super. 2014) (quotation marks

and quotations omitted).

## I. Preclusion of Evidence from Dr. Carroll

In his first issue, Appellant argues the Orphans' Court erred in granting

Ms. McGurk's motion in *limine* to preclude the admission of Dr. Carroll's report

and testimony. Before the Orphans' Court, Ms. McGurk explained:

> Prior to the original hearing date, opposing counsel forwarded a "report of psychological examination dated July 9, 2019," authored by Kenneth R. Carroll, Ph.D. evaluating [Decedent]. Opposing counsel requested that the undersigned attorney stipulate to said report without the need for Dr. Carroll to testify. However, the undersigned attorney disagreed and filed an objection with the Orphans' Court indicating [Ms. McGurk] would not stipulate to said report.
>
> Similarly, in discussions just before the original hearing, the undersigned counsel verbally indicated to opposing counsel that [Ms. McGurk] would be making an oral motion in *limine* to disqualify Dr. Carroll as a witness as his evaluation was untimely as the key date is February 16, 2018, which is the date that the Last Will and Testament was signed by [Decedent]. As highlighted by a brief verbal exchange in [c]ourt, in addition to the above argument, the undersigned attorney further indicated that **said report does not reflect any commentary as to [Decedent's] intellect on any prior dates in time**.
>
> In reviewing said report, there is no mention of Dr. Carroll even reviewing any medical and/or psychological records in rendering his determination. Furthermore, there is no mention of Dr. Carroll reviewing any prior medical and/or psychological records at any time prior to the date of his evaluation. Accordingly, Dr. Carroll's report and any testimony would be highly prejudicial, irrelevant and untimely to the ultimate decision in this matter. As a consequence, the undersigned attorney respectfully requests that This Honorable Court disqualify Dr. Carroll from testifying in this matter and that any mention of said report be stricken from the record.

Motion in *Limine*, 10/19/20, at 1-2 (unnumbered).

Appellant filed a response in which he argued Dr. Carroll should be allowed to testify as an expert and fact witness. Appellant's Response in Opposition to Ms. McGurk's Motion in *Limine*, 10/14/20, at 2-4. Appellant claimed Dr. Carroll's testimony would "be instructive to the [c]ourt regarding weakened intellect." *Id.* at 2-3 (noting weakened intellect "need not rise to the level of lack of capacity." (citations omitted)). Appellant attached Dr. Carroll's "Report of Psychological Examination" as Exhibit A, and Dr. Carroll's Curriculum Vitae as Exhibit B.

As he did with the Orphans' Court, Appellant insists "Dr. Carroll's testimony is relevant to the case." Appellant's Brief at 27, 29. Appellant emphasizes that Ms. McGurk contacted Dr. Carroll, and Dr. Carroll found Decedent to be incompetent. *Id.* at 25-27. Appellant argues:

> Dr. Carroll's report found that Decedent was incompetent. The expert report, commissioned specifically to support Decedent's competency of the 2018 Will made the exact opposite finding, thereby calling into question Decedent's competency at the time of the signing of the 2018 Will. Appellant, through its "undue influence case" merely needs to show that Decedent had a "weakened intellect" at the time of the signing of the 2018 Will, not that Decedent was incompetent.

Appellant's Brief at 17-18.

Appellant describes Dr. Carroll, a psychologist, as "a doctor who performs hundreds of competency examinations." *Id.* at 26. He claims Dr. Carroll could "opine 'to a reasonable degree of medical certainty' as to [Decedent's] condition in 2018." *Id.* at 30. Appellant further asserts Dr.

Carroll's report and testimony were relevant because the Orphans' Court "relied heavily upon [A]ttorney Spe[e]rs['] incorrect diagnosis of Decedent in supporting the 2018 Will." *Id.* Appellant concedes Dr. Carroll evaluated Decedent nearly a year and a half after Decedent executed the 2018 Will. However, Appellant claims Dr. Carroll's testimony was relevant because:

1. Post-execution evidence is admissible.

2. Dr. Carroll was hired [by Ms. McGurk] specifically to support the 2018 Will.

3. The [Orphans' C]ourt admitted and relied heavily [on] the contemporaneous [Attorney] Spe[e]rs testimony[,] finding that testimony relevant and credible.

4. [Dr.] Carroll's testimony, at a minimum, totally contradicted [Attorney] Spe[e]rs' testimony.

Appellant's Brief at 31-32.

Ms. McGurk counters that "Dr. Carroll's report could not have been more stale." Appellee's Brief at 2. Ms. McGurk asserts the Orphans' Court "made the right legal decision in disallowing Dr. Carroll's testimony and his report[.]" *Id.* at 3. She maintains Appellant's "argument that said report retroactively goes back a year and a half for a competency opinion is preposterous." *Id.*

We are unpersuaded by Appellant's argument, which disregards the Orphans' Court's discretion. The Pennsylvania Supreme Court has explained:

> Decisions regarding the admissibility of evidence are vested in the sound discretion of the trial court, and, as such, are reviewed for an abuse of discretion. An abuse of discretion occurs where the trial court reaches a conclusion that overrides or misapplies the law, or where the judgment exercised is manifestly unreasonable, or is the result of partiality, prejudice, bias, or ill will.

***Mitchell v. Shikora***, 209 A.3d 307, 314 (Pa. 2019) (citations omitted).

The Supreme Court offered a "brief recitation of the law" regarding relevance, stating:

> Generally, relevant evidence is admissible and irrelevant evidence is in admissible. Evidence is relevant if it has "any tendency to make a fact [of consequence] more or less probable than it would be without the evidence." Pa.R.E. 401. The threshold for relevance is low given the liberal "*any* tendency" prerequisite. ***Id.*** (emphasis added). Relevant evidence "is admissible, except as otherwise provided by law." Pa.R.E. 402.

***Id.*** (italics in original).

> To the extent Appellant sought to introduce Dr. Carroll as an expert:

> Our standard of review of a trial court's decision to exclude expert testimony is very narrow.

> The admission or exclusion of evidence, including the admission of testimony from an expert witness, is within the sound discretion of the trial court.... [W]e may only reverse upon a showing that the trial court clearly abused its discretion or committed an error of law. To constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party.

***Fabian***, 222 A.3d at 1147 (citations omitted).

The record reveals no abuse of discretion by the Orphans' Court. Dr. Carroll encountered Decedent, for the first and only time, nearly a year and a half after Decedent executed the 2018 Will. ***See*** N.T., 3/17/21, at 8. The Orphans' Court stated its "basis for denying [the admission of evidence from Dr. Carroll] was I didn't think it was relevant." N.T., 3/17/21, at 6; ***see also id.*** at 97 (Orphans' Court stating, "I'm not sure why any of this [proposed

testimony about Dr. Carroll's actions in July 2019] is relevant as to what happened on February 16 of 2018."). The court advised it had "reread the transcript to make my rulings." N.T., 3/17/21, at 8. The court reasoned:

> Any … testimony that Dr. Carroll would have offered as a fact and/or expert witness **would not have been relevant to the Orphans' Court's determination as to whether Decedent had a weakened intellect because his single evaluation occurred sixteen months after the date of the 2018 Will's execution** and twenty months after Decedent first met with Attorney DiOrio.

Orphans' Court Opinion, 4/21/22, at 69 (emphasis added).

Recognizing that "the threshold for relevance is low," the record nonetheless supports the Orphans' Court's decision. ***Mitchell***, ***supra***. In "ascertaining the testator's intention, a will is to be construed <u>as of the date of its execution</u>." ***In re Est. of Tscherneff***, 203 A.3d 1020, 1024 (Pa. Super. 2019) (underline in original, citation omitted). The Orphans' Court properly exercised its discretion in deciding that evidence from Dr. Carroll's interaction with Decedent in July 2019 would not make Decedent's intellect and competency in February 2018, "more or less probable than it would be without the evidence." ***Mitchell***, ***supra***. To the extent that weakened intellect may be "proven through evidence more remote in time from the will's execution," we understand the term "remote" to reference a timeframe **prior** to the will's execution, not after, as remote evidence of undue influence would precede the will's execution. ***In re Estate of Nalaschi***, 90 A.3d at 14.

We also reject Appellant's assertion that the Orphans' Court "relied heavily" on Attorney Speers' testimony concerning Attorney Speers' impressions of Decedent in June 2019. Like the Orphans' Court, we note **Appellant** "called Attorney Speers as a witness in his case in chief," and did not object to the Orphans' Court's "decision to preclude Dr. Carroll's testimony while allowing Attorney Speers to testify." Orphans' Court Opinion, 4/21/22, at 70 (citing N.T., 4/27/21, at 5-48), 72 (same). "In order to preserve a claim on appeal, a party must lodge a timely objection. Failure to raise such objection results in waiver of the underlying issue on appeal." *Amato v. Bell & Gossett*, 116 A.3d 607, 625 (Pa. Super. 2015) (citations omitted).

Waiver notwithstanding,

> The Orphans' Court considered Attorney Speers' testimony regarding Decedent's mental capacity on the date of the execution of the June 28, 2019 Revocation [of the power of attorney] **as corroborative evidence** as to Attorney DiOrio's testimony regarding Decedent's mental capacity on the date of the execution of the 2018 Will.

Orphans' Court Opinion, 4/21/22, at 70 (emphasis added); *id.* at 68 (Orphans' Court stating "Attorney Speers' testimony corroborated Attorney DiOrio's testimony[.]").

Attorney Speers' testimony focused on the conflict between Appellant and Decedent in June 2019, and their dispute about Decedent's POA and Wells Fargo account. *See id.* at 53-54; *see also* N.T., 4/27/21, at 15 (Attorney Speers testifying Decedent was "very clear when he came in as to why he was coming in. He was very sure in his mind, knew his son[, Appellant]. Knew

his son had a power-of-attorney. Knew his son was on joint bank accounts that he had. And he was very concerned when he learned [Appellant] had withdrawn money from the] bank account at Wells Fargo …."). While the Orphans' Court credited Attorney Speers' testimony, the court did not "heavily rely" on it. Appellant's Brief at 18, 27, 30, 32. Rather, the Orphans' Court underscored the testimony of Attorney DiOrio. The court referenced Attorney DiOrio's "multiple observations" in determining, "Attorney DiOrio, the 2018 Will's Scrivener, provided extremely thorough, consistent and credible testimony." *Id.* at 64; *see also id.* at 50-53 (citing notes of testimony); *id.* at 53 (Orphans' Court stating "Attorney DiOrio had sufficient evidence to conclude that Decedent had the necessary testamentary capacity to enter and execute the 2018 Will.").

For the above reasons, we cannot conclude the Orphans' Court abused its discretion in excluding Dr. Carroll's report and testimony.

## I. Undue Influence

In his second issue, Appellant assails the Orphans' Court's determination that Decedent did not execute the 2018 Will as a result of Ms. McGurk's undue influence. Appellant's Brief at 17, 20 ("This case is the 'textbook example' for undue influence."). Appellant argues the Orphans' Court "abused its discretion in its factual findings" because there was "overwhelming evidence" of undue influence. *See id.* at 4, 32. Appellant recites a factual narrative of the evidence in his favor to claim Decedent suffered from a weakened intellect

and was subject to Ms. McGurk's undue influence. *Id.* at 32-41. Appellant asserts the evidence "proved that Decedent, at a minimum, had a 'weakened intellect' at the execution of the 2018 Will." *Id.* at 32. He states: "All the evidence points to Decedent being sickly, mentally impaired, [and] with others controlling his life." *Id.* at 35. Appellant claims, "[i]t was [Ms.] McGurk's world and Decedent was only living in it." *Id.* at 41. Appellant's argument is unconvincing.

Appellant disregards the Orphans' Court's authority and our standard of review:

> When reviewing a decree entered by the Orphans' Court, this Court must determine whether the record is free from legal error and the court's factual findings are supported by the evidence. Because the Orphans' Court sits as the fact-finder, it determines the credibility of the witnesses and, on review, we will not reverse its credibility determinations absent an abuse of that discretion.

*In re Est. of Rivera*, 194 A.3d 579, 583 (Pa. Super. 2018) (citations omitted). "Our scope of review is also limited: we determine only whether the court's findings are based on competent and credible evidence of record." *Id.* We may only reverse the court's factual findings if they are unsupported by the record. *Estate of Scarpaci*, 176 A.3d 885, 888 (Pa. Super. 2017) (citation omitted).

It also bears repeating that in a will contest,

> the hearing judge determines the credibility of the witnesses. **The record is to be reviewed in the light most favorable to appellee**, and review is to be limited to determining whether the orphans' court's findings of fact were based upon legally competent and sufficient evidence and whether there is an error

- 28 -

of law or abuse of discretion. **Only where it appears from a review of the record that there is no evidence to support the court's findings or that there is a capricious disbelief of evidence may the court's findings be set aside**.

*In re Estate of Schumacher*, 133 A.3d at 49-50 (citation omitted, emphasis added).

The Orphans' Court determined that Ms. McGurk established Decedent's proper execution of the 2018 Will. When "the proponent of the will establishes the proper execution of the will, a presumption of lack of undue influence arises." *In re Est. of Smaling*, 80 A.3d at 493 (citation omitted). Thus, Appellant had to "establish, by clear and convincing evidence, a *prima facie* showing of undue influence by demonstrating that: (1) the testator suffered from a weakened intellect; (2) the testator was in a confidential relationship with the proponent of the will; and (3) the proponent receives a substantial benefit from the will in question." *Id.*; *see also In re Clark's Estate*, 334 A.2d at 632; *Estate of Lakatosh*, 656 A.2d 1378, 1383 (Pa. Super. 1995). If the contestant establishes each prong of the tripartite test, the burden shifts to the proponent to produce clear and convincing evidence to affirmatively demonstrate the absence of undue influence. *Id.*

In this case, the burden never shifted to Ms. McGurk because the Orphans' Court, citing liberally and accurately to the record, concluded that Appellant failed to establish Decedent's weakened intellect at the time he executed the 2018 Will. *See* Orphans' Court Opinion, 4/21/22, at 2-60, 63; *see also id.* at 45 (stating, "Upon [Appellant's] failure to prove weakened

intellect by clear and convincing evidence, there was no need to address the remaining elements of undue influence."). The record supports this conclusion. The Orphans' Court reasoned:

> Based upon his multiple observations, Attorney DiOrio, the 2018 Will's Scrivener, provided extremely thorough, consistent and credible testimony that in no way Decedent had "persistent confusion, forgetfulness, and disorientation" and therefore, suffered from a weakened intellect. According to Attorney DiOrio, Decedent knew what he wanted to do as to the 2018 Will, knew what was his property, and adamantly told him exactly what he wanted to do with his property regarding his beloved friend, [Ms.] McGurk, and his son, [Appellant].

*Id.* at 64-65.

The court distinguished, *inter alia*, **In re Est. of Smaling** and **In re Clark's Estate**, in concluding:

> The facts, in this matter, are clearly distinguishable from the facts in **Clark, supra**; **Smaling, supra**; and **Mampe**, [932 A.2d 954, 961-962 (Pa. Super. 2007)]. Unlike the testators in these cases, the Record is devoid of any evidence that Decedent was ever diagnosed with cerebral arteriosclerosis, dementia, or Alzheimer's Disease prior to the 2018 Will's execution. Unlike the testators in these cases, there was no evidence presented that Decedent was in a state of persistent confusion, forgetfulness, or disorientation. Unlike the testators' behavior in these cases, there was no evidence presented that Decedent was unable to manage his affairs, was not oriented to place and time, or did not know the value of anything he had. Upon review of all the evidence presented, none of the witnesses, not even [Appellant], testified about such behavior by Decedent as set forth in these cases. The evidence in this matter speaks quite to the contrary, including the evidence presented by [Appellant].

*Id.* at 66.

Accordingly, the Orphans' Court did not err in concluding Decedent did not have a weakened intellect, and therefore, Decedent was not subject to

Ms. McGurk's undue influence when he executed the 2018 Will. The "best evidence of a testator's intent is the testamentary document itself and the testator's arrangements with his attorney." ***Estate of Agnew v. Ross***, 152 A.3d at 261 (citations omitted). "Only where it appears from a review of the record that there is no evidence to support the court's findings or that there is a capricious disbelief of evidence may the court's findings be set aside." ***In re Estate of Schumacher***, 133 A.3d at 50. In conclusion, our careful review discloses that the evidence and law support the Orphans' Court's decree directing probate of Decedent's February 16, 2018 Will.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/18/2022